FILED
2022 Mar-18  PM 04:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| **DONALD D. MILES,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:20-CV-01143-MHH** |
| | } | |
| **SOCIAL SECURITY** | } | |
| **ADMINISTRATION** | } | |
| | } | |
| **Defendant.** | } | |
| | } | |

## <u>MEMORANDUM OPINION</u>

Donald Miles, proceeding *pro se*, seeks judicial review of a final adverse decision of the Commissioner of Social Security pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  The Commissioner denied Mr. Miles's claims for a period of disability, disability insurance benefits, and supplemental security income.  For the following reasons, the Court finds that substantial evidence supports the Commissioner's decision.

## LEGAL STANDARD FOR DISABILITY UNDER THE SSA

Mr. Miles was represented by an attorney at the administrative level.  (*See* Doc. 10-3, p. 29).  To succeed in his administrative proceedings, Mr. Miles had to prove that he was disabled. *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930

(11th Cir. 2013). "A claimant is disabled if he is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least 12 months." 42 U.S.C. § 423(d)(1)(A).[1]

To determine whether a claimant has proven that he is disabled, an administrative law judge – an ALJ – follows a five-step evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

"The claimant has the burden of proof with respect to the first four steps." *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136–37 (11th Cir. 2009). "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can

---

[1] "For all individuals applying for disability benefits under title II, and for adults applying under title XVI, the definition of disability is the same." https://www.ssa.gov/disability/professionals/bluebook/general-info.htm (last visited March 14, 2022).

perform other jobs that exist in the national economy." *Wright*, 327 Fed. Appx. at 137.

## ADMINISTRATIVE PROCEEDINGS

Mr. Miles filed an application for a period of disability and disability insurance benefits and an application for supplemental security income on September 22, 2014. (Doc. 10-4, pp. 5, 19). He alleged that his disability began on May 9, 2014. (Doc. 10-4, p. 5). The Commissioner denied Mr. Miles's second application on January 23, 2015. (Doc. 10-4, p. 5). Mr. Miles requested a hearing with an ALJ. (Doc. 10-4, p. 5). He testified before an ALJ on December 27, 2016. (Doc. 10-4, p. 5). The ALJ issued an unfavorable decision on January 17, 2017. (Doc. 10-4, pp. 5-13). Based on the records the Court has before it, it does not appear that Mr. Miles challenged the unfavorable decision on his applications in district court. [2]

On June 15, 2017, Mr. Miles protectively filed an application for supplemental security income, (Doc. 10-6, pp. 9-14), and he filed an application for a period of disability and disability insurance benefits, (Doc. 10-6, pp. 2-3). Mr. Miles alleges that his disability began January 12, 2017. (Doc. 10-6, p. 2). The Commissioner initially denied Mr. Miles's applications on September 22, 2017.

---

[2] At the administrative hearing held on March 12, 2019, Mr. Miles testified that he had filed three applications for benefits. He stated that he had last worked in 2012. (Doc. 10-3, pp. 37-38; *see also* Doc. 10-8, p. 166).

(Doc. 10-5, pp. 2-8).  Mr. Miles requested a hearing before an ALJ.  (Doc. 10-5, pp. 9-12).  The ALJ held a hearing on March 12, 2019 and issued an unfavorable decision on July 5, 2019.  (Doc. 10-3, pp. 11-24).

On August 13, 2019, Mr. Miles filed a statement in which he indicated that he no longer wanted his attorney to represent him.  (Doc. 10-3, pp. 9-10).  The same day, Mr. Miles filed with the Appeals Council exceptions to the ALJ's decision.  (Doc. 10-5, p. 55).  He asked for time to file additional evidence and indicated that he was seeking an MRI.  (Doc. 10-5, p. 55).  On August 14, 2019, the Appeals Council granted Mr. Miles's request for additional time.  (Doc. 10-3, pp. 7-8).  On May 12, 2020, the Appeals Council denied Mr. Miles's request for review, (Doc. 10-3, pp. 2-4), making the Commissioner's decision final and a proper candidate for this Court's judicial review.  *See* 42 U.S.C. § 405(g).

## MR. MILES'S ADMINISTRATIVE RECORD

*Mr. Miles's Medical Records*

To support his applications for SSI and disability insurance, Mr. Miles submitted medical records that relate to diagnoses and treatment of his lower back pain, sciatica, diabetes, and heart condition. The records date to 2010.  The Court has reviewed the medical records in the administrative record and finds that the records that follow are the most relevant to Mr. Miles's 2017 benefit applications.

*Mr. Miles's Physician Appointments and ER Visits*

Mr. Miles sought treatment in the Emergency Department at St. Vincent's Hospital in Birmingham on March 28, 2017. (Doc. 10-8, p. 50). Mr. Miles complained of pain on the right side of his neck. (Doc. 10-8, p. 51). Mr. Miles reported that he had injured his neck moving furniture three weeks before. (Doc. 10-8, p. 51). Mr. Miles walked and conversed with ease and without assistance. (Doc. 10-8, p. 51). Mr. Miles was noted to have a history of diabetes, arthritis, high blood pressure, and cervical radiculopathy. (Doc. 10-8, p. 51). Mr. Miles's physical exam indicated tenderness in the cervical region, but he had a full range of motion. (Doc. 10-8, p. 52). A CT scan of his cervical spine revealed no fracture or subluxation, but it showed mild degenerative changes at C5-C6. (Doc. 10-8, p. 53). Mr. Miles received prescriptions for prednisone, etodolac, and methocarbamol for the pain, inflammation, and spasms in his back and gabapentin for his diabetic foot. (Doc. 10-8, p. 53).[3] Mr. Miles was advised to follow up with his primary care physician. (Doc. 10-8, p. 52).

-------------------

[3] Prednisone is an anti-inflammatory medication that is commonly prescribed for low pack pain. https://www.spineuniverse.com/treatments/medication/oral-steroids-back-pain (last visited on March 15, 2022).

"Etodolac is a nonsteroidal anti-inflammatory drug [] used to treat mild to moderate pain, and it helps to relieve symptoms of arthritis [], including inflammation, swelling, stiffness, and joint pain." https://www.mayoclinic.org/drugs-supplements/etodolac-oral-route/side-effects/drg-20069756?p=1 (last visited on March 15, 2022).

On May 3, 2017, Mr. Miles visited the Emergency Room at St. Vincent's East. (Doc. 10-8, p. 110).  Mr. Miles complained of an injury to his right hand that he thought may have been caused by an insect bite.  (Doc. 10-8, p. 114).  The physical exam showed "no evidence of [a] bite."  (Doc. 10-8, p. 114).  Mr. Miles reported a history of diabetes, high blood pressure, and arthritis and indicated that he had neck spasms.  (Doc. 10-8, p. 114).  Mr. Miles was diagnosed with a lumbar strain and lumbar muscles spasms.  (Doc. 10-8, p. 115).  Mr. Miles was instructed to apply ice to the sore area, and he was prescribed Naproxen and Robaxin.  (Doc. 10-8, p. 117).[4]

On August 8, 2017, Mr. Miles had an appointment at the primary care clinic at Cooper Green Mercy Hospital.  (Doc. 10-9, p. 21).  Mr. Miles complained that his feet hurt, and he reported that he had pain and muscle spasms in his lower back. (Doc. 10-9, p. 21).  Mr. Miles's blood pressure was 133/93, and his blood sugar was

---

Methocarbamol (Robaxin) is used to "treat the symptoms of muscle spasms caused by pain or injury." https://www.rxlist.com/robaxin-drug.htm (last visited on March 15, 2022).

Gabapentin is used to treat pain from diabetic neuropathy, which happens when nerves in the feet damaged by diabetes cause chronic burning pain.  https://www.drugs.com/medical-answers/gabapentin-nerve-pain-3557479/ (last visited on March 15, 2022).

[4] Naproxen is an NSAID pain reliever like Aleve, and Robaxin is a muscle relaxer. https://www.kidney.org/blog/ask-doctor/aleve-exact-same-thing-naproxen-if-so-why-one-prescription-and-one-over-counter#:~:text=Aleve%20is%20the%20same%20as,liquid%20in%20the%20prescription%20form. (last visited March 18, 2022); https://www.healthline.com/health/pain-relief/ibuprofen-vs-naproxen#:~:text=Ibuprofen%20and%20naproxen%20are%20both,matters%20which%20one%20you%20choose. (last visited March 18, 2022); https://www.rxlist.com/robaxin-drug.htm (last visited on March 15, 2022).

219.  (Doc. 10-9, p. 21).  Mr. Miles reported that he had had diabetes for seven years and that he was controlling his back pain with medication.  (Doc. 10-9, p. 21).  Mr. Miles indicated that he would go to physical therapy for his back pain.  (Doc. 10-9, p. 21).  Mr. Miles was scheduled to return to the clinic in three months.  (Doc. 10-9, p. 22).

At the request of Disability Determination Services, Mr. Miles had a psychological evaluation by Dr. William B. Beidleman on August 18, 2017.  (Doc. 10-8, p. 165).  Mr. Miles was 40 years old, and he reported that he did not have mental health problems.  (Doc. 10-8, p. 165).  Mr. Miles reported that in the past he had taken BuSpar, but he stated that he had been out of the medication for a month.  (Doc. 10-8, p. 165).[5]  Mr. Miles stated that he attended school through ninth grade, and he obtained his GED when he was 28 years old.  (Doc. 10-8, p. 165).  He indicated that he had last worked in 2012 and that he lost his job making car parts "because 'they fired me for being lazy and going to the bathroom (diabetes).'"  (Doc. 10-8, p. 166).

He stated that he experienced "long term bereavement" after the death of his 7-year-old son 15 years earlier.  (Doc. 10-8, p. 166).  Dr. Beidleman noted that Mr.

_____

[5] BuSpar belongs to a class of medications used to treat anxiety.  It is approved for generalized anxiety disorder.  https://www.nami.org/About-Mental-Illness/Treatments/Mental-Health-Medications/Types-of-Medication/Buspirone-(BuSpar) (last visited March 10, 2022).

Mr. Miles brought to his appointment with Dr. Beidleman several empty pill bottles and reported that he was "out of all his medications now."  (Doc. 10-8, p. 165).

Miles was grossly alert and oriented to person, time, place, and circumstance.  Mr. Miles's concentration and attention were "fair to good."  (Doc. 10-8, p. 166).  Mr. Miles's recent and remote memory were relatively good.  His general fund of information was poor.  (Doc. 10-8, p. 166).  Mr. Miles described his daily activities as playing with his cousin's kids, watching TV, and playing X-Box.  (Doc. 10-8, p. 166).

Dr. Beidleman opined that Mr. Miles had "depressive disorder (dysthymia), with mild anxious distress, late onset, with pure dysthymic syndrome; mild generalized anxiety disorder; and probable alcohol abuse by history."  (Doc. 10-8, p. 168).  Dr. Beidleman believed that Mr. Miles could function independently and that he could understand and remember simple instructions and respond appropriately to fellow employees and supervisors, but he might "have difficulty coping with significant work pressures."  (Doc. 10-8, p. 167).  Dr. Beidleman's prognosis regarding Mr. Miles's response to favorable treatment was guarded because Mr. Miles was not taking medications and gave vague responses regarding compliance with medications.  (Doc. 10-8, p. 167).

On November 7, 2017, Mr. Miles visited his primary care physician, Dr. Mark Fruendt, at Cooper Green Hospital.  (Doc. 10-9, p. 32).  Dr. Fruendt noted that Mr. Miles had poorly controlled diabetes.  (Doc. 10-9, p. 32).  Dr. Fruendt wrote that Mr. Miles "was on [L]antus in the past which helped" control his diabetes, but "[Mr.

Miles] stopped tak[ing] the medication." (Doc. 10-9, p. 32).[6] Mr. Miles reported chronic lower back pain with some pain in his left leg and anxiety that improved with medication. (Doc. 10-9, p. 32). Mr. Miles's blood pressure was 150/87 and his blood sugar was 259. (Doc. 10-9, p. 32). Dr. Fruendt referred Mr. Miles to the diabetic clinic and asked him to come back for a follow-up visit in three months. (Doc. 10-9, p. 32).

Mr. Miles went to the Urgent Care Clinic at Cooper Green Hospital on December 19, 2017. (Doc 10-9, p. 35). He complained of lower back pain. He reported that his pain medication had not helped. He stated that he was waiting for an MRI that was scheduled in February. (Doc. 10-9, p. 35). Mr. Miles stated that he was feeling "weak in his knees," but he explained that he was told he had bad arthritis. (Doc 10-9, p. 35). Mr. Miles's musculoskeletal exam was positive for stiffness, joint pain, and joint swelling. (Doc. 10-9, p. 35). Mr. Miles was asked to stopped taking Flexeril and to try Zanflex for a short period for his back pain. (Doc. 10-9, p. 38). He was instructed to alternate heat and cold compression for his back and to follow up with his primary care physician. (Doc. 10-9, p. 38).

Mr. Miles visited Dr. Abyar, an orthopedic physician, at Cooper Green Hospital on February 5, 2018. (Doc. 10-9, p. 39). Mr. Miles complained of chronic

_____

[6] Lantus is a long-acting insulin used to treat adults with Type 2 diabetes for the control of blood sugar. Long-acting insulin "starts to work several hours after injection and keeps working for 24 hours." https://www.drugs.com/lantus.html (last visited March 10, 2022).

low back pain.  (Doc. 10-9, p. 39).  Mr. Miles explained that he had a sharp pain on his left side.  (Doc. 10-9, p. 39).  Mr. Miles stated that he had had a problem with his back for 12 years.  Mr. Miles explained that he been in car accidents in 2005 and 2007.  (Doc. 10-9, p. 39).  Mr. Miles rated his pain as 8/10.  He stated that his pain was worse with movement.  (Doc. 10-9, p. 39).  Mr. Miles reported that medication improved his symptoms.  (Doc. 10-9, p. 39).  Dr. Abyar noted that Mr. Miles's gait was normal and that his range of motion was near normal with a mild limitation with left lateral bending. (Doc. 10-9, pp. 41-42).

Mr. Miles visited Dr. Fruendt on February 7, 2018.  (Doc. 10-9, p. 44).  Mr. Miles complained that he was in pain.  (Doc. 10-9, p. 44).  Dr. Fruendt noted that Mr. Miles had poorly controlled diabetes.  His blood sugar was 284 and his A1c was 12.  (Doc. 10-9, p. 44).  Dr. Fruendt noted that he wrote Mr. Miles a prescription for Lantus, but Mr. Miles was using metformin.  (Doc. 10-9, p. 44).  He explained that Mr. Miles's condition was complicated by diabetic polyneuropathy for which Mr. Miles took gabapentin and Norco.  (Doc. 10-9, p. 44).  He stated that Mr. Miles reported that physical therapy did not help.  (Doc. 10-9, p. 44).  Mr. Miles's blood pressure was 158/92, and he described his pain level as 7/10.  (Doc. 10-9, p. 45).  Mr. Miles's heart had a regular rhythm and rate with no murmur, rub, or gallop. (Doc. 10-9, p. 45).

Mr. Miles visited the Emergency Department at St. Vincent's Birmingham on May 6, 2018.  (Doc. 10-9, p. 137).  Mr. Miles complained of constant low back pain that began while he was retrieving groceries from his car two days before.  (Doc. 10-9, p. 140).  Mr. Miles reported that the pain went across his lower back and radiated to both knees.  Mr. Miles reported that he took Norco and Gabapentin for pain.  (Doc. 10-9, p. 140).  Mr. Miles's heart rate and rhythm were regular, and he had a normal range of motion.  Mr. Miles was diagnosed with low back pain and sciatica.  (Doc. 10-9, p. 142).  The ER physician noted that Mr. Miles moved with difficulty at discharge.  He instructed Mr. Miles to follow up with his primary care physician. (Doc. 10-9, p. 141).

Mr. Miles had a follow-up visit with Dr. Fruendt on May 8, 2018.  (Doc. 10-9, p. 48).  Mr. Miles's blood sugar was 139.  (Doc. 10-9, p. 48).  Dr. Fruendt noted that Mr. Miles's blood sugar was down 100 points from the previous reading.  (Doc. 10-9, p. 48).  Mr. Miles reported that he had uncontrolled anxiety and chronic lower back and hip pain.  (Doc. 10-9, p. 48).  Dr. Fruendt noted that Mr. Miles was referred to an orthopedist, but Mr. Miles was unable to get a steroid injection to treat his back pain because his blood sugar was uncontrolled.  (Doc. 10-9, p. 48).  Dr. Fruendt also noted that he recommended physical therapy for Mr. Miles, but Mr. Miles did not go.  (Doc. 10-9, p. 48).  Mr. Miles was diagnosed with paravertebral muscle spasm, low back pain, diabetes, and diabetic polyneuropathy.  (Doc. 10-9, p. 49).

On August 21, 2018, Mr. Miles had an appointment with Dr. Fruendt.  Mr. Miles told Dr. Fruendt that he felt better when he was taking 70/30 insulin[7], than we he was taking Lantus.  (Doc. 10-9, p. 61).  Mr. Miles reported that he had chronic hip and lumbar pain.  (Doc. 10-9, p. 61).  Mr. Miles's blood pressure was 160/89, and he reported that his pain was 8/10.  (Doc. 10-9, p. 62).  Dr. Fruendt increased Mr. Miles's insulin and asked him to keep a blood sugar log.  Dr. Fruendt asked Mr. Miles to return for a follow-up visit in three months.  (Doc. 10-9, p. 62).

On October 8, 2018, Mr. Miles had a follow-up visit with Dr. Abyar in the orthopedic clinic at Cooper Green.  (Doc. 10-10, p. 56).  Mr. Miles stated that his symptoms had not changed since his previous visit.  (Doc. 10-10, p. 56).  Mr. Miles rated his pain as 7/10.  (Doc. 10-10, p. 56).  Dr. Abyar noted that Mr. Miles had muscle pain and joint swelling and pain.  (Doc. 10-10, p. 56).  Mr. Miles's musculoskeletal exam showed no abnormalities in his hips and knees.  (Doc. 10-10, p. 58).  Dr. Abyar found no changes in Mr. Miles's condition as compared to his previous visit.  (Doc. 10-10, p. 58).  Dr. Abyar instructed Mr. Miles to continue using home exercises, activity modification, a lumbar brace, and NSAIDs.  (Doc. 10-10, p. 58).

---

[7] Humulin 70/30 releases a hormone called insulin into the body to lower blood sugar level in the blood.  It contains an intermediate-acting insulin that works for many hours throughout the day to help lower your blood sugar level.  It also contains a regular-acting insulin that starts to work within 30 minutes after injection and keeps working for about 6 hours. https://www.goodrx.com/humulin-70-30/what-is (last visited on March 10, 2022).

On October 9, 2018, Mr. Miles visited the Emergency Department at St. Vincent's Birmingham. (Doc. 10-9, p. 78). Mr. Miles complained of numbness and tingling on his right side. (Doc. 10-9, p. 78). Mr. Miles reported that he was standing when he felt a sudden onset of numbness and tingling on the right side of his body. (Doc. 10-9, p. 78). Mr. Miles also reported that he experienced numbness, tingling, and weakness on the right side of his face. (Doc. 10-9, p. 78). Mr. Miles admitted that he was not compliant with his diabetes and hypertension treatment. (Doc. 10-9, p. 70). Mr. Miles denied shortness of breath, confusion, loss of vision, speech changes, nausea, or vomiting. (Doc. 10-9, pp. 78, 70). Mr. Miles was alert and oriented to person, place, time, and situation. (Doc. 10-9, p. 80). Mr. Miles had no focal neurological deficit. (Doc. 10-9, p. 80). Mr. Miles's heart had a regular rhythm and rate with no murmur. (Doc. 10-9, p. 80). Mr. Miles's back was not tender, and he had normal range of motion and alignment. (Doc. 10-9, p. 80). Mr. Miles's labs showed that his blood sugar was high, and his troponin was low. (Doc. 10-9, p. 81). Mr. Miles had a CT of his head that showed no intracranial abnormality. (Doc. 10-9, p. 81). Mr. Miles was diagnosed with acute right-side weakness and acute ischemic stroke. (Doc. 10-9, p. 81). He was admitted for overnight observation. (Doc. 10-9, p. 124).

At discharge, Mr. Miles's diagnoses were diabetes, hyperglycemia, hypertension, chronic back pain, tobacco use, and noncompliance with treatment.

(Doc. 10-9, p. 126). Based on an echocardiogram, the physician who treated Mr. Miles noted that Mr. Miles's left ventricle systolic function was normal with an estimated ejection fraction of 60-65%; his left regional wall motion was normal with no abnormalities; his study was normal. (Doc. 10-9, pp. 126). The physician stated that Mr. Miles "was noted to have suboptimally controlled hypertension, and poorly controlled [Type II diabetes] as well, with hyperglycemia. He admitted to non-compliance with insulin regimen at times. . . . He was recommended to follow up with his PCP to continue working towards optimization of glycemic and hypertensive control. 4 minutes of smoking cessation counseling provided today. Discussed risks associated with tobacco use, particularly in the setting of patient's other comorbidities." (Doc. 10-9, p. 124). Mr. Miles was instructed to monitor his glucose and to follow up with Dr. Fruendt in one to two weeks. (Doc. 10-9, p. 126). He was told to bring his diabetes log with him to his appointment. (Doc. 10-9, p. 126).

On November 19, 2018, Mr. Miles sought treatment in the Emergency Department at UAB Hospital. (Doc. 10-10, p. 8). Mr. Miles complained of sharp chest pain that radiated to his shoulders. He reported that he had a history of hypertension and Type II diabetes. (Doc. 10-10, p. 8). Mr. Miles reported that his chest pain had begun the day before. Mr. Miles reported shortness of breath, excessive sweating, nausea, and vomiting. (Doc. 10-10, p. 8). Mr. Miles reported

that he did not have a history of coronary artery disease and that he had never had a similar episode of cardiac symptoms.  (Doc. 10-10, p. 8).  Mr. Miles reported that he had gone to St. Vincent's ER the day before and "was told he was having a heart attack and needed stents."  (Doc. 10-10, pp. 8-9).  Mr. Miles stated he was given aspirin and heparin, but he did not get the catheter because "they were being rude to him."  (Doc. 10-10, p. 8).  At UAB, Mr. Miles did not appear to be in acute distress. (Doc. 10-10, p. 14).  He had a regular heart rate and rhythm with no murmur.  (Doc. 10-10, p. 14).  Mr. Miles had an EKG and electrocardiogram.  (Doc. 10-10, p. 11). Mr. Miles's EKG showed that he did not have a STEMI, but his EKG was suspicious for acute changes.  (Doc. 10-10, p. 11).[8] Mr. Miles's troponin was 62.  (Doc. 10-10, p. 9). [9]  Mr. Miles reported that his troponin was 120 at St. Vincent's.  (Doc. 10-10, p. 11).

---

[8] A STEMI is a type of pf heart attack that is "more serious and has a greater risk of serious complications and death."  https://my.clevelandclinic.org/health/diseases/22068-stemi-heart-attack#:~:text=An%20ST%2Delevation%20myocardial%20infarction,certain%20type%20of%20diagnostic%20test.

[9] "Troponin is a type of protein found in the muscles of your heart. . . . When heart muscles become damaged, troponin is sent into the bloodstream.  As heart damage increases, greater amounts of troponin are released in the blood."  https://medlineplus.gov/lab-tests/troponin-test/#:~:text=Troponin%20is%20a%20type%20of,are%20released%20in%20the%20blood.

Mr. Miles was taken to the Cath Lab.  (Doc. 10-10, pp. 7, 13).[10]  Mr. Miles was diagnosed with NSTEMI.  (Doc. 10-10, p. 12).[11]  He underwent a procedure to have a left heart catheter and a PCI.  (Doc. 10-10, pp. 12, 31).  The procedure revealed that Mr. Miles had 90% ramus occlusion and 70-80% LCx disease.  (Doc. 10-10, pp. 12-13).  Mr. Miles had a PCI [12] to ramus, but no intervention in LCx.  (Doc. 10-10, pp.  13-15).  Mr. Miles was admitted to the critical care unit for further care and medical management.  (Doc. 10-10, pp. 12, 23).  Mr. Miles's procedure was successful, reducing his stenosis from 95% to 0%.  (Doc. 10-10, pp. 24, 31).  Mr. Miles's A1c was 10.1, indicating that his diabetes was uncontrolled.  (Doc. 10-10, p. 21).

The hospital discharged Mr. Miles the next day.  (Doc. 10-10, p. 4).  Mr. Miles's daily medications included aspirin, atorvastatin, clopidogrel (Plavix), insulin glargine, lisinopril, metformin, and metoprolol.  (Doc. 10-10, p. 4).  Mr. Miles received prescriptions for buspirone for anxiety, nitroglycerin for chest pain, and

---

[10] The physician in the ER contacted cardiology.  The cardiology department asked that Mr. Miles was brought to the Cath Lab for a heart catheter.  The ER called a code blue for myocardial infarction.  (Doc. 10-10, pp. 7, 11).

[11] Because it causes less damage to the heart, an NSTEMI is a less severe form of a heart attack than the STEMI.  https://www.baptisthealth.com/services/heart-care/conditions/non-st-elevation-myocardial-infarction (last visited March 11, 2022).

[12] Percutaneous coronary intervention (PCI) is a "nonsurgical procedure that uses a catheter [] to place a small structure called a stent to open up blood vessels in the heart that have been narrowed by plaque buildup, a condition known as atherosclerosis."  https://www.heartandstroke.ca/heart-disease/treatments/surgery-and-other-procedures/percutaneous-coronary-intervention (last visited March 15, 2022).

tramadol for mild knee pain to be taken as needed. (Doc. 10-10, p. 4). Mr. Miles requested generic medications that he could take once a day to help with affordability and compliance. (Doc. 10-10, p. 19). Mr. Miles was told to follow up with his primary care physician and to call and make an appointment for cardiac rehabilitation. (Doc. 10-10, p. 6).

Mr. Miles had an appointment with Dr. Fruendt on November 28, 2018. (Doc. 10-10, p. 54). Mr. Miles's visit was a follow-up appointment after his heart attack and stent procedure. (Doc. 10-10, p. 54). Mr. Miles reported that he was having problems with some of his medications. (Doc. 10-10, p. 54). One medication was causing his right side to tingle, and it caused his finger to feel numb. (Doc. 10-10, p. 54). Mr. Miles also reported also that his chest would begin to hurt within two hours of taking Plavix. (Doc. 10-10, p. 54). A review of Mr. Miles's cardiovascular symptoms revealed that he had mild chest pain but no palpitations or edema. (Doc. 10-10, p. 54). Mr. Miles had a regular heart rhythm and rate without murmur, rub, or gallop. (Doc. 10-10, p. 54). Dr. Fruendt noted that Mr. Miles had poorly controlled diabetes mellitus, and Mr. Miles reported that he had joint and lower back pain. (Doc. 10-10, p. 54). Mr. Miles's blood pressure was 149/96, and his pain level was 7/10. (Doc. 10-10, p. 54).

On December 19, 2018, Mr. Miles sought treatment in the Emergency Department at St. Vincent's Birmingham. (Doc. 10-10, p. 75). He complained of

chest pain and right shoulder pain that had lasted for three days.  (Doc. 10-10, p. 75).

Mr. Miles reported that his pain had become progressively worse.  (Doc. 10-10, p.

75).  Mr. Miles denied back pain, abdominal pain, nausea, vomiting, shortness of

breath, and fever.  (Doc. 10-10, pp. 75-76).  Mr. Miles reported that his chest pain

was exacerbated by coughing and movements.  (Doc. 10-10, p. 75).  The physician

noted that Mr. Miles was slightly hypertensive but otherwise had stable vital signs.

(Doc. 10-10, p. 77).   Mr. Miles's EKG had "some new Inferior ST depression and

T wave inversions in inferiorlaterally," (Doc. 10-10, p. 77), but his x-ray showed

"no acute cardiopulmonary abnormality," (Doc. 10-10, p. 78).   Mr. Miles had

another EKG that showed new ischemic changes.  (Doc. 10-10, p. 79).  The ER

physician wanted to admit Mr. Miles for "chest pain workup."  (10-10, p. 79).  Mr.

Miles refused admission and asked to be discharged.  (Doc. 10-10, p. 79).   The

physician explained to Mr. Miles that he would risk having a heart attack and dying

if he left. (Doc. 10-10, p. 79).  Mr. Miles indicated that he understood the risk and

stated that he would follow up with his cardiologist.  (Doc. 10-10, p. 79).  Mr. Miles

was told to return to the ER if he had chest pain, shortness of breath, vomiting, or

excessive sweating.  (Doc. 10-10, p. 79).  Mr. Miles was discharged against medical

advice about 12 hours after he arrived for treatment.  (Doc. 10-10, pp. 79-80).

Mr. Miles had an appointment at the cardiology clinic at Cooper Green on

January 17, 2019 on a referral from UAB.  (Doc. 10-10, p. 44).  Mr. Miles reported

chest discomfort and left sided heaviness that had lasted about ten minutes, but he explained that the discomfort was not as intense as the pain he had experienced when he had a heart attack. (Doc. 10-10, p. 44). Mr. Miles reported no nausea, vomiting, sweating, or palpitations. (Doc. 10-10, p. 44). Mr. Miles reported that he had been short of breath and added that he always felt lightheaded. (Doc. 10-10, p. 44). Mr. Miles stated that he did not work much, and he reported he did not walk much before his heart attack. (Doc. 10-10, p. 44).

The cardiologist who treated Mr. Miles in the clinic noted that Mr. Miles relieved his chest pain by taking one nitroglycerin tablet. (Doc. 10-10, p. 44; *see also* Doc. 10-10, p. 53). The cardiologist instructed Mr. Miles to continue taking Lisinopril, aspirin, Plavix, and atorvastatin and his medications for hypertension and diabetes. (Doc. 10-10, p. 53). The cardiologist increased Mr. Miles's dosage of Metoprolol XL, and she added a prescription for Amlodipine. (Doc. 10-10, p. 53).

On February 27, 2019, Mr. Miles visited Dr. Fruendt. (Doc. 10-10, p. 42). Dr. Fruendt indicated that Mr. Miles had a history of chronic low back pain and osteoarthritis. (Doc. 10-10, p. 42). Mr. Miles stated that pain medication helped his lower back pain. (Doc. 10-10, p. 42). Mr. Miles rated his pain as 5/10. (Doc. 10-10, p. 42). Dr. Fruendt noted that Mr. Miles's heart had a regular rhythm and rate without murmur, rub, or gallop. (Doc. 10-10, p. 42). Dr. Fruendt asked Mr.

Miles to return to the clinic for a follow-up appointment in three months. (Doc. 10-10, p. 43).

*Mr. Miles's Physical Therapy Treatment*

On August 30, 2017, Mr. Miles had a physical therapy evaluation at Cooper Green. (Doc. 10-9, p. 23). Mr. Miles reported that he had had back pain for years. (Doc. 10-9, p. 23). He stated that "he [] continue[d] to have pain with all types of activities[.]" Mr. Miles explained that he was unable to stand or walk for long periods of time and that nothing helped his back pain. (Doc. 10-9, p. 23). Mr. Miles rated his pain as 6/10. (Doc. 10-9, p. 23). According to a low back pain questionnaire, Mr. Miles had 71% crippling back pain that "impinge[d] on all aspects of [his] life." (Doc. 10-9, p. 23). Mr. Miles's gait had a mildly guarded pattern, and his range of motion was decreased in his lumbar region. (Doc. 10-9, p. 23). Mr. Miles's strength in all four extremities was 4/5. (Doc. 10-9, p. 24). Herman Turner, the physical therapist, indicated that Mr. Miles's treatment goals were to increase strength in his quads, to walk without discomfort, to decrease pain, to have independent performance of instrumental activities of daily living, and to achieve 5/5 muscle strength in his lower extremities. (Doc. 10-9, p. 24). Mr. Turner noted that Mr. Miles had good potential for reaching his goals. (Doc. 10-9, p. 24).

Mr. Miles began physical therapy at Cooper Green on September 5, 2017. (Doc. 10-9, p. 26). From September 5, 2017, to November 11, 2017, Mr. Miles had

therapy routinely to strengthen his back, hips, and lower extremities. (Doc. 10-9, p. 26-31). Mr. Miles reported that exercises helped with his pain, but he reported that he continued to have pain. (Doc. 10-9, pp. 26, 28). Initially, Mr. Thurman noted that Mr. Miles demonstrated some generalized muscular weakness and muscular fatigue with exercises. (Doc. 10-9, pp. 26-27). Mr. Thurman later noted that Mr. Miles began to demonstrate "increased overall activity tolerance with increase[d] reps and resistance with exercises." (Doc. 10-9, p. 28). At his last visit, Mr. Miles reported that he had gotten stronger, but he continued to experience pain. (Doc. 10-9, p. 31). Mr. Thurman confirmed that Mr. Miles had accomplished his rehab goals, but Mr. Miles continued to have lumbar pain. Mr. Thurman added that Mr. Miles might benefit from a pain clinic evaluation. (Doc. 10-9, p. 31).

After an evaluation on May 18, 2018, Mr. Miles began another period of physical therapy at Cooper Green to treat the pain in his lower back. (Doc. 10-9, p. 50). During these visits, Mr. Miles had no new complaints and reported that he was doing well overall. (Doc. 10-9, pp. 53-59). At the beginning of Mr. Miles's therapy, Mr. Thurman noted that Mr. Miles exhibited some generalized weakness. (Doc. 10-9, pp. 53-54). As Mr. Miles continued therapy, Mr. Thurman stated that Mr. Miles's overall strength progressed with each session. (Doc. 10-9, pp. 55-59). Mr. Thurman treated Mr. Miles for approximately two months. (Doc. 10-9, pp. 53-59). On

August 9, 2018, Mr. Miles was discharged from physical therapy because he cancelled his appointment and did not reschedule.  (Doc. 10-9, p. 59).

*Mr. Miles's Administrative Hearing*

Mr. Miles's administrative hearing took place on March 12, 2019.  (Doc. 10-3, p. 30).  Mr. Miles testified that he lived with his cousin and his cousin's kids. (Doc. 10-3, p. 44).  He stated that he did not do chores.  (Doc. 10-3, p. 44).  Mr. Miles testified that he spent most days watching TV.  (Doc. 10-3, p. 45).  Mr. Miles testified that he was not able to work because he experienced pain that had become worse.  (Doc. 10-3, p. 34).  He stated that he had problems with diabetes and lower back pain, and he had had a heart attack.  (Doc. 10-3, p. 34).

Mr. Miles testified that he was taking insulin correctly, but it did not control his blood sugar.  (Doc. 10-3, pp. 34-35).  He explained that he did not take his insulin correctly when he was first diagnosed with diabetes because he did not like needles. (Doc. 10-3, p. 36).  Mr. Miles testified that, in 2018, he began taking his insulin as prescribed and, as a result, his A1c had decreased.  (Doc. 10-3, p. 36).  Mr. Miles testified that because of his diabetes, he had to go to the restroom about three times an hour about once a week.  (Doc. 10-3, pp. 47-48).  He explained that he had problems at work because he was in the restroom so much.  (Doc. 10-3, p. 48).  He testified that someone at work thought that he was being lazy and hiding from work. (Doc. 10-3, p. 48).

Mr. Miles testified that he had pain in his lower back. (Doc. 10-3, p. 36). Mr. Miles initially testified that he was not diagnosed with an issue with his back or his hip, but when he was questioned by his attorney, Mr. Miles recalled that he was diagnosed with lower back spasms, and he confirmed that he had a diagnosis of sciatica. (Doc. 10-3, pp. 36, 45-46). Mr. Miles testified that he took Norco 10.5 for pain three or four times a day. (Doc. 10-3, p. 46). Mr. Miles described his back pain as a sharp pain that went from one side of his back to the other all the way to the bottom. (Doc. 10-3, p. 46). Mr. Miles testified that his doctor believed that his lower back pain stemmed from his hip. (Doc. 10-3, p. 36). He testified that he was waiting to have an MRI on his hip. (Doc. 10-3, pp. 38-39). Mr. Miles explained that he was a patient at Cooper Green and that the hospital would not perform an MRI unless a patient was paralyzed in pain. (Doc. 10-3, p. 38). Mr. Miles testified that he could stand for ten minutes without discomfort, and he could stand for a total of three hours daily. (Doc. 10-3, p. 47). Mr. Miles testified that he could lift and carry ten pounds. (Doc. 10-3, p. 47). He stated that he did not have problems with sitting. (Doc. 10-3, p. 47).

Mr. Miles testified that his heart condition started in November of 2018. (Doc. 10-3, p. 39). Mr. Miles stated that he had to have a stent placed in one artery, and the other artery was 70% blocked. (Doc. 10-3, p. 40). The ALJ noted that Mr. Miles was diagnosed with acute coronary syndrome and stated that the hospital ruled out

that he had had a heart attack.  (Doc. 10-3, p. 40).  Mr. Miles testified that during his

cardiac event in November of 2018, he went to two hospitals.  (Doc. 10-3, p. 41).

He stated that he was told at both hospitals that he had had a heart attack.  (Doc. 10-

3, p. 41).  Mr. Miles testified that he had had a stress test about two weeks before the

hearing.  (Doc. 10-3, p. 41).  He stated that he stopped smoking ahead of the stress

test because he was warned that smoking increased the chances that something could

go wrong with his heart.  (Doc. 10-3, pp. 41, 44).  He was concerned that he might

need to have surgery again if he continued to smoke cigarettes.   (Doc. 10-3, pp. 41,

44).  Mr. Miles testified that about two weeks before the hearing, he was prescribed

blood thinners and that he continued to take nitroglycerin about twice a week for

chest pain.  (Doc. 10-3, pp. 41-42).   Mr. Miles explained that his chest pain was

caused by confusion and stress.   (Doc. 10-3, p. 49).  Mr. Miles stated that his chest

pain usually lasted about five minutes, but it could last up to 30 minutes.  (Doc. 10-

3, p. 49).  He testified that after the pain stopped, he generally had to sit down and

relax.  (Doc. 10-3, p. 49).

Renee Smith, a vocational expert, testified that Mr. Miles worked as a forklift

operator, a hand packager, a small parts assembler, a clip bolter, a wrapper, and an

assembler.  (Doc. 10-3, p. 60).  The ALJ asked Ms. Smith to assume there was an

individual of Mr. Miles's age, education, and work history who would be able to

perform the full range of light work, but the individual should never operate foot

controls, drive commercially, use ladders, ropes, scaffolds, or hazardous machinery, and the individual could never be exposed to unprotected heights or extreme temperatures. (Doc. 10-3, p. 61). The ALJ asked whether the individual could perform Mr. Miles's past work. (Doc. 10-3, p. 61). Ms. Smith testified that the individual should be able to perform Mr. Miles's past work as a small parts assembler. (Doc. 10-3, p. 61). Ms. Smith testified that there were at least 150,000 small parts assembler jobs nationally. (Doc. 10-3, p. 61). The ALJ asked Ms. Smith whether there were other jobs the individual could perform. (Doc. 10-3, pp. 61-62). Ms. Smith testified that the individual could perform the jobs of a marker, garment sorter, and rag inspector. (Doc. 10-3, p. 62).

Ms. Smith testified if the individual were limited to a full range of sedentary jobs, he would not be able to perform the assembler position; however, Ms. Smith testified that the individual would be able to perform the job of a nut sorter, spotter, and bench hand. (Doc. 10-3, p. 62). The ALJ asked Ms. Smith if the individual who was limited to the full range of sedentary jobs were "limited to sitting four to eight hours, standing and/or walking two of eight hours, would the individual be able to perform any full-time work?" (Doc. 10-3, p. 62). Ms. Smith testified that the individual would not. (Doc. 10-3, p. 63).

On this administrative record, the ALJ concluded that Mr. Miles was not disabled.

## STANDARD OF REVIEW

The scope of review in this matter is limited.  "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'"  *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether there is substantial evidence in the record to support the ALJ's factual findings.  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  In evaluating the administrative record, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ.  *Winschel,* 631 F.3d at 1178 (internal quotations and citation omitted). If substantial evidence supports the ALJ's factual findings, then the Court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards.  If the district court finds an error in the ALJ's application of the law, or if the Court finds that the ALJ failed to

provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the Court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## DISCUSSION

Mr. Miles did not submit a brief to support his contention that the Commissioner erroneously denied his claim for disability insurance benefits. (Doc. 1, p. 3). In his district court complaint, Mr. Miles indicated that he was trying to get an MRI to strengthen his case, but Covid was complicating his effort. (Doc. 1, pp. 3-4). The Court infers from this statement that Mr. Miles believes the ALJ improperly discounted the evidence regarding his back pain. Mr. Miles has not offered another specific challenge to the ALJ's decision. Because Mr. Miles has not identified specific errors in the ALJ's decision, the Court will review the ALJ's decision generally with an emphasis on the ALJ's analysis of the administrative evidence relating to Mr. Miles's back pain to determine if the ALJ's decision is reasonable and supported by substantial evidence and to determine whether the ALJ applied correct legal standards. *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988). As noted above, under the Social Security Act, an ALJ follows a five-step process to evaluate an alleged disability. 20 C.F.R. § 404.1520. The Court follows that process as it examines the ALJ's decision.

*Step One:  Substantial Gainful Activity*

At step one, an ALJ must determine whether a claimant is engaging in substantial gainful activity.   20 C.F.R. § 404.1520(a)(4)(i).   "Substantial work activity" is work activity that involves doing significant physical or mental activities. 20 C.F.R. § 404.1572(a).  "Gainful work activity" is work that is done for pay or profit.   20 C.F.R. § 404.1572(b).   If an ALJ finds that a claimant engages in substantial gainful activity, the claimant is not disabled. 20 C.F.R. § 404.1520(b).  If the ALJ finds that an individual has not engaged in substantial gainful activity, the analysis proceeds to step two.

The ALJ found that Mr. Miles had not engaged in substantial gainful activity since January 12, 2017, the alleged onset date.   (Doc. 10-3, p. 16).   At the administrative hearing, Mr. Miles testified that he had not been able to work since January 12, 2017.  (Doc. 10-3, p. 38).   In his application for disability insurance benefits Mr. Miles stated, "I AGREE WITH MY EARNINGS RECORDS, I HAVEN'T BEEN WORKING SINCE 12/2012 BECAUSE MY DISABLING CONDITIONS ARE TOO SEVERE TO EVER RETURN TO WORK AGAIN." (Doc. 10-6, p. 3).   Therefore, the ALJ did not err in her determination at step one. Consequently, the analysis proceeds to step two.

*Step Two:  Severe Impairments*

At step two, an ALJ must determine whether the claimant has a medically determinable impairment or a combination of impairments that is severe.  20 C.F.R. § 404.1520(c).  An impairment is severe if it significantly limits an individual's ability to perform basic work activities.  20 C.F.R. § 404.1520(a)(4)(ii).  If a claimant has a severe impairment or combination of impairments, the analysis proceeds to step three.  20 C.F.R. § 416.921.

The ALJ determined that Mr. Miles was suffering from the severe impairments of diabetes mellitus, degenerative disc disease, cervical radiculopathy, sciatica, diabetic neuropathy, and acute ischemic stroke.  (Doc. 10-3, p. 16).  The ALJ also determined, after considering the "'paragraph' B criteria," that Mr. Miles suffered from the non-severe impairments of dysthymia with mild anxious distress and generalized anxiety disorder.  (Doc. 10-3, pp. 16-17).  The medical evidence in the administrative record supports the ALJ's findings with respect to Mr. Miles's severe and non-severe impairment.  Therefore, the ALJ did not err at step two, and the analysis proceeds to step three.[13]

---

[13] At step two, the ALJ did not list Mr. Miles's heart condition as an impairment.  The omission is noteworthy, but it does not create reversible error because "the finding of any severe impairment, whether or not it qualifies as a disability and whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe, is enough to satisfy the requirement of step two." *Jamison v. Bowen,* 814 F.2d 585, 588 (11th Cir. 1987).  The ALJ discussed Mr. Miles's heart condition as she evaluated Mr. Miles's RFC, so she did not disregard the condition entirely. *See Gray v. Comm'r of Soc. Sec.*, 550 Fed. Appx. 850, 853-54 (11th Cir. 2013) (holding that an error in the severity finding at step two would be harmless if the ALJ later

*Step Three:  Meeting a Listing*

At step three, an ALJ must determine whether a claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  *See* 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526.  If a claimant's impairment or combination of impairments meet or equal a Listing and meet the duration requirement, then the claimant is disabled.  If none of the Listings' criteria is fully met, then the ALJ must proceed to step four, 20 C.F.R. § 416.909, but first the ALJ must determine the claimant's residual functional capacity or RFC.  20 C.F.R. § 404.1520(e).  As discussed, a claimant's RFC describes the claimant's ability to do physical and mental work on a sustained basis despite the limitations caused by the claimant's severe and non-severe impairments.  20 C.F.R. § 404.1520(e).  In making an RFC determination, an ALJ must consider all of the relevant medical and other evidence in the record, including evidence of impairments that are not severe.  20 C.F.R. § 404.1520(e) and 404.1545(g)(2).

Here, based on her review of the medical evidence, the ALJ concluded that Mr. Miles did not have an impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments in 20 C.F.R. Part

────────────────

discussed the impairment or limitations alleged by the claimant elsewhere in the five-step sequential process).

404, Subpart P, Appendix 1.  (Doc. 10-3, p. 18).  The ALJ considered the Listings for spine disorders and diabetes and found that Mr. Miles's impairments did not meet or equal the criteria for either listing.  The ALJ also considered "the claimant's impairments, the medical record as a whole, and the available listings," and concluded that no impairment or combination of impairments met the criteria for a Listing.  (Doc. 10-3, p. 18).

Substantial evidence supports the ALJ's conclusion.  For example, a March 28, 2017, CT scan of Mr. Miles's cervical spine revealed no fracture or subluxation and showed only mild degenerative changes at C5-C6.  (Doc. 10-8, p. 53).  Mr. Miles had an MRI on November 29, 2017, that showed no nerve root compression.  (Doc. 10-9, p. 16).  The radiologist concluded that Mr. Miles had "[m]ild multilevel spondylosis without significant spinal canal stenosis or nerve root impingement at any lumbar level."  (Doc. 10-9, p. 16).  With respect to his diabetes, at the administrative hearing, Mr. Miles testified that when he began taking insulin correctly in 2018, his A1c decreased, indicating that Mr. Miles's diabetes could be controlled with mediation.  (Doc. 10-3, pp. 36, 47).  Thus, the ALJ properly compared evidence in the administrative record to the Listings for spine and endocrine disorders, considered the medical record as a whole, and determined that Mr. Miles did not meet a Listing.  Therefore, the Court turns to the ALJ's RFC analysis.

In reaching an RFC determination, an ALJ must follow a two-step process in which she must first determine whether a claimant has an underlying medically determinable physical or mental impairment that can reasonably be expected to produce the claimant's pain or symptoms.  If an underlying physical or mental impairment is identified, then the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's pain and symptoms to determine the extent to which they limit the claimant's functioning.

The ALJ followed the two-step process to evaluate the limiting effects of Mr. Miles pain and symptoms.  (Doc. 10-3, pp. 19-20).  First, the ALJ acknowledged that Mr. Miles testified that he had insulin-dependent diabetes and pain so severe that it prevented him from working.  (Doc. 10-3, p. 19).  The ALJ also noted that Mr. Miles testified that he had a stent placed in 2018 and that he experienced chest pain twice a week.  (Doc. 10-3, p. 19).  The ALJ listed the medication prescribed for Mr. Miles to treat chest pain, diabetes, and nerve pain and acknowledged that Mr. Miles testified that he used pain medication "several times a day for back pain." (Doc. 10-3, pp. 19, 45).

The ALJ also recognized the limitations that Mr. Miles attributed to these impairments.  The ALJ wrote that "[Mr. Miles] denied performing any household chores or yard work.  He stated that he stopped smoking cigarettes three weeks prior to the hearing.  The claimant stated that he spends most of the day watching

television.  He stated that he takes pain medication several times a day for back pain.

He denied being able to sit for prolonged period or carry groceries." (Doc. 10-3, p.

19).  The ALJ determined that medical evidence did not support Mr. Miles's

testimony about the intensity, persistence, and limiting effects of his impairments

and related symptoms.  (Doc. 10-3, p. 19).  Substantial evidence supports the ALJ's

finding.

The ALJ discussed Mr. Miles medical records from 2016 to 2018.  (Doc.  10-

3, pp. 19-22).  The ALJ stated that Mr. Miles's diabetes appeared "hard to control,"

but she pointed to records which indicated that Mr. Miles did not routinely comply

with his diabetes medication.  (Doc.  10-3, p. 21; *see* Doc. 10-3, p. 36; Doc. 10-9,

pp. 21, 32, 44, 124; Doc. 10-10, p. 19).  The ALJ also evaluated evidence of Mr.

Miles's heart condition, noting that Mr. Miles "was hospitalized overnight on

November 19, 2018, for a non-ST elevated myocardial infarction . . .  He underwent

cardiac catherization. . . . Several days later during a follow-up visit at CGMH, the

examining physician's assessment was acute heart attack, diabetic polyneuropathy,

hip pain, diabetes, and low back pain."  (Doc. 10-3, p. 21).  The ALJ wrote that the

records show that Mr. Miles had a "mild cardiac incident" that was quickly treated

and controlled.  (Doc. 10-3, p. 21; *see* Doc. 10-10, pp. 24, 31).  With respect to Mr.

Miles's back pain, the ALJ discussed Mr. Miles's March 2016 St. Vincent's record

which indicated that Mr. Miles sought treatment for pain which radiated down his

right leg.  (Doc. 10-3, p. 19).  The ALJ noted that the treating physician diagnosed

Mr. Miles with sciatica.  (Doc. 10-3, p. 19).  The ALJ discussed several other

occasions in which Mr. Miles sought treatment for his back pain at St. Vincent's and

Cooper Green Hospital during 2017 and 2018.  (Doc. 10-3, p. 20; Doc. 10-8, p. 51;

Doc. 10-9, pp. 16, 21).  The ALJ stated that Mr. Miles was taking routine

maintenance medication for his back pain.  (Doc. 10-3, p. 21).  Finally, the ALJ

noted that no physician had "indicated that [Mr. Miles] was disabled or otherwise

unable to perform work related activities, and the ALJ found that Mr. Miles had no

significant mental impairment that caused functional limitations.  (Doc. 10-3, p. 21;

*see* Doc. 10-8, p. 167).  Considering the administrative record as a whole, the ALJ

determined that the opinion evidence and the medical treatment records suggested

greater sustained capacity than Mr. Miles described and concluded that Mr. Miles's

"self-reported limitations" were "not consistent with the medical evidence and he

simply alleges greater of debilitation than what objective evidence can support.  The

same is true for his mental impairments as well."  (Doc. 10-3, p. 22).

Based on the evidence in the record, the ALJ determined that Mr. Miles had

the RFC to perform:

> [t]he full range of light work as defined in 20 CFR 404.1567(b) and
> 416.967(b) except, he should never operate foot controls or engage in
> commercial driving.  Additionally, the claimant should never climb
> ladders, ropes, or scaffolds.  He should also avoid all exposure to
> hazardous machinery and unprotected heights.  The claimant should
> also avoid concentrated exposure to temperature extremes.

(Doc. 10-3, p. 18). "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F. R. § 404.1567(b). "If someone can do light work, . . . he can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b). "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria is met." 20 C.F.R. § 404.1567(a).

The ALJ's findings concerning Mr. Miles's RFC is somewhat inconsistent with Mr. Miles's testimony about his limitations. Mr. Miles stated that he could lift 10 pounds without hurting his back; light work requires lifting up to 20 pounds. (Doc. 10-3, p. 47). He stated that he could stand for approximately three hours and that sitting was not a problem, but he did not "like to stay still for long." (Doc. 10-

3, p. 47).[14]  Mr. Miles testified that other than frequent urination once a week or so, his diabetes would not affect his work.  (Doc. 10-3, p. 48).  And he stated that when he experienced chest pain, it sometimes would last up to 30 minutes, but "[m]ost of the time it last[ed] 5 minutes" after which he would sit and relax.  (Doc. 10-3, p. 49). Had the ALJ accepted Mr. Miles's testimony about his limitations, Mr. Miles would be limited to sedentary work, but the ALJ discounted Mr. Miles's testimony about the extent of his limitations, and substantial evidence supports that finding.

On this record, the Court concludes that substantial evidence supports the ALJ's RFC for Mr. Miles for light work with limitations that account for his chest and back pain.

### Step Four:  Past Relevant Work

At step four, an ALJ must determine whether a claimant has the RFC to perform past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  The term past relevant work refers to work performed—as an individual actually performed it or as it is generally performed in the national economy—within the past 15 years.  20 C.F.R. § 416.920(f).  The work must have lasted long enough for the individual to learn to do the job.  20 C.F.R. § 404.1960(b) and 416.965.  If the ALJ determines that a claimant is be capable of performing past relevant work, then the claimant is not

---

[14] Later, Mr. Miles stated that he did not "do any lifting and carrying . . . and walking." (Doc. 10-3, p. 49).

disabled.  20 C.F.R. § 404.1520(a)(4)(iv).   If the ALJ finds that a claimant cannot perform past relevant work, then the analysis proceeds to the fifth step. 20 C.F.R. § 404.1520(a)(4)(v).

Based on Mr. Miles's RFC and the testimony of a vocational expert, the ALJ concluded that Mr. Miles could perform his past relevant work as a small parts assembler.   (Doc. 10-3, pp. 22, 47).  A small parts assembler is work at the light, unskilled level.  (Doc. 10-3, p. 60).  Consequently, substantial evidence supports the ALJ's determination at step four, and substantial evidence supports the ALJ's finding that Mr. Miles was not disabled as defined by the Social Security Act.[15]

### Step Five: Other Work

Alternatively, the ALJ proceeded to step five and determined that Mr. Miles could perform other work commensurate with his RFC, age, education, and work experience. 20 C.F.R. § 404.1520(g).   At step five, an ALJ must establish the existence, in significant numbers, of jobs in the national economy that the claimant can perform.  20 C.F.R. §§ 404.1520(g), 404.1560(c).

The ALJ properly relied on testimony from a vocational expert to determine whether there were other jobs that Mr. Miles could perform.  *See Phillips v.*

_____

[15] If Mr. Miles was limited to sedentary work, he would not be able to perform small parts assembler work.  (Doc. 10-3, p. 62).  Even if the ALJ erred in finding that Mr. Miles could perform light work, there would be no error in a finding for sedentary work, and the VE listed three sedentary unskilled jobs that Mr. Miles could perform.  (Doc. 10-3, p. 62).  Therefore, any error in the light RFC or the finding that Mr. Miles could perform his past relevant work as a small parts assembler is harmless.

*Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004); *Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999).  Expert vocational testimony, in response to a hypothetical question accurately reflecting a claimant's RFC, provides substantial evidence to support a finding that a claimant can perform other jobs in the national economy. *See Phillips*, 357 F.3d at 1240.

At Mr. Miles's administrative hearing, the VE testified that Mr. Miles could perform various representative unskilled light category jobs, including marker, garment sorter, and rag inspector.  (Doc. 10-3, p. 62).[16]  Accordingly, the ALJ determined that Mr. Miles had not been under a disability as defined by the Social Security Act, from January 12, 2017, through the date of the ALJ's decision.  (Doc. 10-3, p. 23).  Substantial evidence supports the ALJ's conclusion that Mr. Miles was not disabled.[17]

## CONCLUSION

For the reasons discussed above, the Court finds that substantial evidence supports the ALJ's decision, and the ALJ applied proper legal standards.  The Court

---

[16] The VE also testified that Mr. Miles could perform the representative unskilled sedentary jobs of nut sorter, spotter, and bench hand.  (Doc. 10-3, p. 62).

[17] Because Mr. Miles raised it in his complaint, the Court notes that the Appeals Council gave Mr. Miles sufficient time to present supplemental relevant evidence.  Though he indicated in his August 2020 complaint that he was trying to get another MRI to support his district court case, (Doc. 1, p. 4), the Court has not received additional evidence from Mr. Miles as of the date of this opinion.  The Clerk of Court mailed a briefing letter to Mr. Miles on February 9, 2021.  Mr. Miles has not filed anything in response.

may not reweigh the evidence or substitute its judgment for that of the Commissioner. Accordingly, the Court affirms the Commissioner's decision. The Court will enter a separate final judgment consistent with this memorandum opinion.

**DONE** and **ORDERED** this March 18, 2022.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE